# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 3, 2014 Session

## STATE OF TENNESSEE v. DESMOND OBRIAN ANDERSON AND CAMILLIA HARRISON

**Appeal from the Circuit Court for Madison County**
**No. 13-84     Donald H. Allen, Judge**

---

**No. W2013-02162-CCA-R3-CD  - Filed November 26, 2014**

---

A Madison County jury convicted Desmond Obrian Anderson of aggravated burglary, especially aggravated kidnapping, and aggravated robbery.  The jury convicted Camillia Harrison of aggravated burglary and aggravated robbery.  The trial court ordered the defendants to serve effective sentences of twenty years in the Tennessee Department of Correction.  On appeal, Defendant Anderson asserts that: (1) the evidence is insufficient to support his convictions; (2) the trial court improperly denied his motion to sever after his co-defendant had testified; and (3) the trial court erred when it failed to sentence him as an Especially Mitigated Offender.  Defendant Harrison asserts that: (1) the trial court should have admitted the transcript of the preliminary hearing into evidence; and (2) the trial court should have severed the defendants' charges in this case.  After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ROGER A. PAGE and ROBERT L. HOLLOWAY, JR., JJ., joined.

Joe H. Byrd, Jr., and Jennifer D. Free, Jackson, Tennessee, for the Appellant, Camillia Harrison.

Gregory D. Gookin, Jackson, Tennessee, for the Appellant, Desmond Obrian Anderson.[1]

Herbert H. Slatery, III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; James G. Woodall, District Attorney General; and Brian M. Gilliam, Assistant District Attorney General for the Appellee, State of Tennessee.

---

[1]Desmond Obrian Anderson did not request oral argument.  He submitted his case on brief.

**OPINION**
**I. Background and Facts**

This case arises from a home invasion on the night of August 31, 2012. A Madison County grand jury indicted the defendants for aggravated burglary, especially aggravated kidnapping, and aggravated robbery. At a trial on the charges, the parties presented the following evidence: Shareese Ragland, the victim, testified that she lived in the Hartland Place Apartments in Madison County in August of 2012, with her two-month-old baby and the baby's father, Charles Washington. On the night of August 31, 2012, she arrived home to her apartment with her baby at approximately 10:00 p.m. Outside of her apartment she observed two men, one of whom was Defendant Anderson. She stated that, the week before this incident, Defendant Anderson and Defendant Harrison had separately been to her home with her nephew to see Mr. Washington.

Ms. Ragland testified that Defendant Anderson and the other man were "standing right outside my door leaned over across the balcony" talking when she walked up the steps to her apartment. Neither man spoke to Ms. Ragland, but she noticed the two men "look[ing] [her] up and down" as she unlocked the door to her apartment. Once inside the apartment, Ms. Ragland fed her baby, ate dinner, and put her baby to sleep in her arms. As she sat watching television at around 11:00 p.m., there was a knock at the door. Ms. Ragland stated that she did not "open [the] door for just anybody," but she could see the top of Defendant Harrison's head and her eyes through the peephole, so she opened the door. Once the door was open, however, Defendant Anderson and the other man were standing in the doorway.

Ms. Ragland testified that Defendant Anderson asked her where Mr. Washington was, and she responded that he was at work. She said that she did not think the men believed her. Defendant Anderson was wearing a bandana wrapped around the lower portion of his face but was otherwise dressed in the same clothing he had been wearing when she had seen him earlier. Ms. Ragland said that she attempted to close the door, but Defendant Anderson "put his feet in the crack of the door and started pushing the door back open." Defendant Anderson then brought out a black and gray handgun from behind him. Ms. Ragland said that she stopped struggling with the door when she saw the gun because she was holding her baby at the time.

Ms. Ragland testified that Defendant Anderson and the other man entered her apartment. The other man searched the house and, when they did not find anyone else present, both men began going through her belongings. At some point, she heard a "tap" on the door. Ms. Ragland believed it might be Mr. Washington, so she yelled out, "Baby, don't come in the house. He got a gun." Defendant Anderson opened the door slightly, and she saw that it was Defendant Harrison. Ms. Ragland recalled that Defendant Harrison remained

-2-

in the doorway where she and Defendant Anderson whispered. At some point in her communication with Defendant Anderson, Defendant Harrison motioned toward Ms. Ragland's bedroom, and then the "other man" went into the bedroom.

Ms. Ragland testified that, while both men went through her bedroom, the unidentified man ordered her to get in "the closet." She stated that she did not want to go inside the closet and did not believe she was free to leave the closet. Next, the two men put her in the bathroom and ordered her not to leave the bathroom. She said Defendant Anderson pointed the hand gun at her but never made any threats specific to the gun. He told her, "Shut-up. I ain't going to hurt you, but if you keep talking, then I am." Ms. Ragland stated that she remained in the bathroom for approximately an hour before determining that the men were gone. She said she sat in the bathroom waiting for the men to leave until approximately 1:00 a.m. Because the television was on she was unsure of whether any noise she heard was from the men or the television.

Ms. Ragland explained that the apartment had two bedrooms but "the landlord had that second bedroom blocked off." She recalled that the two men used a butter knife to unlock the door to the second bedroom and enter. She later found the butter knife on the floor by the bedroom door. Ms. Ragland stated that she asked the men, "what was going on?" She testified that the men told her that "[Mr. Washington] supposed to had robbed [Defendant Harrison] earlier that day." Ms. Ragland stated that she never learned what was taken from Defendant Harrison but that the two men took three cellular telephones, six or seven baseball caps, three or four "throwback jerseys," a pair of black boots, her baby's Social Security card, jewelry, an EBT card, and $35.00 from her residence. She said that she cancelled the EBT card the following day.

Ms. Ragland stated that the only items that she actually saw the men take were the cellular telephones. The other items she found missing the following day while cleaning up the mess the men had created while going through her belongings. She described her clothes as being thrown "everywhere, all out of every drawer," and her mattress was "flipped off [her] bed."

Ms. Ragland testified that, after the men left and she had exited the bathroom, she went to her "godsister's" apartment to call the police and stayed there for the remainder of that night. She stated that, at a later point, Mr. Washington received a text message sent from one of the stolen telephones. The text message stated, " tell that bitch she cancelled her card, and I'm going to cancel her."

On cross-examination by Defendant Anderson's attorney, Ms. Ragland testified that Mr. Washington lost his cellular telephone before she could show the text message to the

police. Ms. Ragland stated that none of the property taken from her apartment had been returned to her. She agreed that she had a prior conviction for theft of property valued under $500.00.

On cross-examination by Defendant Harrison's attorney, Ms. Ragland agreed that Defendant Harrison did not have a gun, threaten her, or take any property from her on the night of the incident. Ms. Ragland agreed that she initially told the police that the female involved in this crime was named "Shae." Approximately a week later she clarified with police that the woman's nickname was "Shondapoo," before telling police the woman involved was Camillia Harrison. Ms. Ragland explained that "Shae" and "Shondapoo" were what "they" and her nephew called Defendant Harrison when she had previously been in Ms. Ragland's home. Ms. Ragland stated that, upon finding out Defendant Harrison's "real" name, she conveyed the name "Camillia Harrison" to the police working on the case.

The State announced the conclusion of its case-in-chief, and Defendant Harrison presented the following evidence in her defense: Defendant Harrison testified that she had prior convictions for theft of property valued over $1,000 and identity theft. Defendant Harrison denied being at Ms. Ragland's residence on August 31, 2012, or having had any contact with Ms. Ragland prior to that date. When asked where she was on that date, Defendant Harrison responded, "I don't actually remember where I was, but I know I wasn't there." She further denied having seen Defendant Anderson on August 31, 2012.

On cross-examination, Defendant Harrison confirmed that Defendant Anderson was her cousin. She agreed that she had "dealings" with Mr. Washington previously and that she had told the police that she had given Mr. Washington "some pills once or twice before." She further agreed that she "had dealings" with Mr. Washington three or four times but maintained that she never went inside his and Ms. Ragland's apartment but remained outside in the breezeway. Defendant Harrison agreed that she told the police that she had seen Mr. Washington's "girlfriend and her baby" before and that she had described Mr. Washington's apartment as "kind of bare" inside. She explained this statement to police about the inside of the apartment, by stating that she had observed the inside of the apartment while walking past their open front door. Defendant Harrison explained discrepancies between her testimony at trial and her statement to the police by saying that she had not read her police statement before signing it because she "trusted" the police officer to write down what she had said. She stated she was not surprised that her police statement indicated that she had sold the pills to Mr. Washington, but she maintained that she had given the pills to him. Defendant Harrison agreed that she had told the police that Mr. Washington had tried to kill her "several times." She explained that Mr. Washington had appeared at her home with a gun, and she fled. She said that she did not report this incident to the police when it occurred because she did not know Mr. Washington's "real name." Defendant Harrison said that she

did not know why Mr. Washington had tried to kill her.

Aubrey Richardson, a Jackson Police Department investigator, testified that he interviewed Ms. Ragland and composed a photographic line-up of suspects. He showed the photographic line-up to Ms. Ragland, and he ultimately signed the warrants for the arrests of the defendants. Investigator Richardson said that, during the course of the investigation, Ms. Ragland had told the police that she was trying to learn the name of the female suspect, but she knew only nicknames. Ms. Ragland had provided the reporting officer with one nickname for the female suspect and provided Investigator Richardson with a different nickname. Investigator Richardson said that Ms. Ragland had provided him with the nickname "Shondapoo." He said that he was familiar with this nickname as it related to another person, Tashonda Monique Davis, that he had investigated in unrelated cases. He stated that Ms. Davis and Defendant Harrison had different hair styles but that Ms. Davis "carrie[d] herself" similar to Defendant Harrison and the two shared similar "physical features." Investigator Richardson said that, before he could further investigate Ms. Davis, Ms. Ragland produced the name Camillia Harrison and was "confident" that Defendant Harrison was the woman who had been at her apartment that night. Ms. Ragland explained to Investigator Richardson that all three names she had provided, she had obtained from friends and relatives while describing the suspect to them.

On cross-examination, Investigator Richardson confirmed that he also interviewed Defendant Harrison. In her statement to police, she indicated that she was familiar with Ms. Ragland's apartment and stated that she had sold drugs to Mr. Washington in the apartment. She denied any role in the crimes that occurred at Ms. Ragland's apartment on the night of August 31, 2012. Investigator Richardson agreed that Defendant Harrison told him that Mr. Washington had attempted to kill her in the past but that Investigator Richardson was unable to substantiate her claim. He confirmed that it is common in his work to find people who use nicknames rather than their legal names.

Investigator Richardson testified about Ms. Ragland's identification of Defendant Harrison in the photographic line-up that he prepared. He described Ms. Ragland's identification as "immediate" and without hesitation.

On redirect examination, Investigator Richardson confirmed that Ms. Davis was not included in the photographic line-up. He explained that he had discussed with Ms. Ragland the possibility of Ms. Davis as a suspect because of the nickname provided by Ms. Ragland, but Ms. Ragland stated that she knew of Ms. Davis and was "certain" it was not Ms. Davis. Ms. Ragland told him that "a couple of people in the neighborhood" used the nickname "Shondapoo." Based upon this discussion with Ms. Ragland, Investigator Richardson did not include Ms. Davis in the photographic line-up.

Based on this evidence, the jury convicted Defendant Anderson of aggravated burglary, especially aggravated kidnapping, and aggravated robbery. The jury convicted Defendant Harrison of aggravated burglary and aggravated robbery. The trial court sentenced Defendant Anderson as a Range I, standard offender, to concurrent sentences of five years for the aggravated burglary conviction, ten years for the aggravated robbery conviction, and twenty years for the especially aggravated kidnapping conviction, for a total effective sentence of twenty years. The trial court sentenced Defendant Harrison as a Range II, multiple offender, to concurrent sentences of ten years for the aggravated burglary conviction and twenty years for the aggravated robbery, for a total effective sentence of twenty years. It is from these judgments that the defendants now appeal.

## II. Analysis

On appeal, Defendant Anderson asserts that: (1) the evidence is insufficient to support his convictions; (2) the trial court improperly denied his motion to sever after his co-defendant had testified; and (3) the trial court erred when it failed to sentence him as an especially mitigated offender. Defendant Harrison asserts that: (1) the trial court should have admitted the transcript of the preliminary hearing into evidence; and (2) the trial court should have severed the defendants' charges in this case.

### A. Defendant Anderson
### 1. Sufficiency of the Evidence

Defendant Anderson contends that the evidence is insufficient to support his convictions. He asserts that Ms. Ragland's testimony provided no motive for his alleged conduct and inconsistencies between Ms. Ragland's trial testimony and her written statement to police undermine the validity of the jury's verdict. The State responds that there is sufficient evidence upon which a jury could find the Defendant guilty beyond a reasonable doubt of aggravated burglary, especially aggravated kidnapping, and aggravated robbery. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct

evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

As relevant here, aggravated burglary is the entry of a habitation without the effective consent of a property owner with intent to commit a felony, theft, or assault. *See* T.C.A. §§ 39-14-402(a)(1), -403(a) (2014). A habitation is any structure designed or adapted for the overnight accommodation of persons. *Id*. § 39-14-401(1)(A). A person commits especially aggravated kidnapping when he uses a deadly weapon to knowingly remove or confine another unlawfully so as to interfere substantially with the other's liberty. *Id*. § 39-13-302, -305 (a)(1). And finally, a conviction for aggravated robbery, as relevant to this case, requires proof beyond a reasonable doubt that Defendant Anderson committed an "intentional or knowing theft of property from the person of another by violence or putting the person in fear" with the use of a deadly weapon. *Id*. §§ 39-13-401(a), -402(a)(1).

The evidence, considered in the light most favorable to the State, shows that Defendant Anderson was waiting outside Ms. Ragland's apartment when she arrived home on the night of August 31, 2012, and observed Ms. Ragland enter her apartment. Later, Ms. Ragland responded to a knock at her door and upon seeing Defendant Harrison through the peephole on the door, Ms. Ragland opened her apartment door. Upon opening the door, she no longer saw Defendant Harrison but saw Defendant Anderson with a bandana tied around the lower half of his face. She also saw another man. When Ms. Ragland attempted to shut her door, Defendant Anderson blocked the door with his foot, brandished a gun, and forced his way into the apartment. The two men ransacked Ms. Ragland's apartment and took numerous items without her consent. While doing so, the two men confined Ms. Ragland and her two-month-old baby in a closet and then a bathroom, where she remained for approximately an hour in fear that the intruders remained in her home. In our view, this evidence supports the jury finding that Defendant Anderson entered Ms. Ragland's apartment without her consent, confined Ms. Ragland in a closet and a bathroom with the threat of a gun, and took numerous items and cash from Ms. Ragland.

Defendant Anderson contends that the inconsistencies in Ms. Ragland's testimony at trial with her prior statement to police necessitated that "no reasonable jury" could have accredited her testimony. We reiterate that the trier of fact resolves questions concerning the credibility of witnesses, the weight and value of the evidence, and all factual issues raised by the evidence; an appellate court should not re-weigh or re-evaluate the evidence. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *Bland*, 958 S.W.2d at 659. Furthermore, a verdict of guilt by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in favor of the prosecution's theory of the case. *Bland*, 958 S.W.2d at 659. In this case, by its verdict, the jury accredited Ms. Ragland's testimony and resolved any inconsistencies in favor of the State's theory that Defendant Anderson committed the offenses for which he was convicted.

Accordingly, we conclude that the proof is sufficient to support Defendant Anderson's

convictions beyond a reasonable doubt. The Defendant is not entitled to relief.

## 2. Severance

Defendant Anderson contends that the trial court should have granted his motion to sever after Defendant Harrison testified that she and the Defendant were cousins. The State responds that the trial court acted within its discretion when it denied the motion to sever. We agree with the State.

The Tennessee Rules of Criminal Procedure address the severance of defendants in Rules 8, 13, and 14. Rule 8(c) provides that an indictment, presentment, or information may charge two or more defendants:

> (1) if each of the defendants is charged with accountability for each offense included:
>
> (2) if each of the defendants is charged with conspiracy, and some of the defendants are also charged with one or more offenses alleged to be in furtherance of the conspiracy; or
>
> (3) even if conspiracy is not charged and all of the defendants are not charged in each count, if the several offenses charged:
>
> > (A) were part of a common scheme or plan; or
> >
> > (B) were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others.

The decision to grant or deny severance rests within the sound discretion of the trial court. *State v. Howell*, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000) (citing *State v. Coleman*, 619 S.W.2d 112 (Tenn. 1981)). "The test is whether or not the defendant was clearly prejudiced in his defense by being jointly tried with his co-defendant." *Id.* (citing *State v. Wiseman*, 643 S.W.2d 354 (Tenn. Crim. App. 1982)). This Court cannot interfere with the exercise of discretion afforded to the trial court absent a showing of clear abuse. *Id.* (citing *Coleman*, 619 S.W.2d at 116).

The State correctly notes that there is no proof in the record that Defendant Anderson filed a pretrial motion to sever. *See* Tenn. R. Crim. P. 14(1)(A) (providing "A defendant's motion for severance of offenses or defendants shall be made before trial, except that a motion for severance may be made before or at the close of all evidence if based on a ground

not previously known. A defendant waives severance if the motion is not timely.") At the close of proof, Defendant Anderson's attorney "renew[ed] our motion for severance" based upon Defendant Harrison's testimony that she and Defendant Anderson were cousins. The trial court denied the motion, stating:

> I think [Defendant Harrison] was asked a question at some point, and she said that they were cousins, but she specifically, . . . testified that she certainly was not present and never been to that - - inside that residence. I mean, that's what she testified to. So, I don't know that she was asked any questions about [Defendant] Anderson specifically. I think the only testimony reference that she made was that she and [Defendant] Anderson were cousins.

Defendant Anderson contends that there had been "no connection" established between the co-defendants until Defendant Harrison's testimony that the two were cousins. He claims that this link "ostensibly made it easier for the jury to find that both defendants would be working in concert to ransack Ragland's home."

We do not agree with Defendant Anderson's characterization of the proof at trial. The victim testified that she opened her front door after recognizing Defendant Harrison through the peephole but then found Defendant Anderson actually standing in her doorway. After Defendant Anderson had entered the apartment, the victim heard another knock at the door. This time Defendant Anderson opened the door and Ms. Ragland saw Defendant Harrison. The victim observed the defendants whispering to one another and Defendant Harrison pointing Defendant Anderson to the back bedroom. This testimony showed a relationship between Defendant Harrison and Defendant Anderson in the commission of these crimes.

Accordingly, we conclude that the trial court did not abuse its discretion in denying Defendant Anderson's motion to sever. Defendant Anderson is not entitled to relief.

### 3. Sentencing

Defendant Anderson challenges the trial court's classification of him as a Range I, Standard offender rather than an Especially Mitigated offender pursuant to Tennessee Code Annotated section 40-35-109. The State responds that the trial court properly considered the enhancement and mitigating factors and imposed a sentence consistent with the purposes and principles of the Sentencing Act. We agree with the State.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed

sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In *State v. Bise*, the Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" 380 S.W.3d 682, 708 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001); *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise,* 380 S.W.3d at 709-10. In other words, so long as the trial court sentences a defendant within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

A trial court "may find" a defendant is an "especially mitigated offender" if (1) the defendant has no prior felony convictions; and (2) the court finds mitigating, but no enhancement factors. T.C.A. § 40-35-109(a) (2014). The trial court may reduce either an especially mitigated offender's minimum sentence by ten percent, his release eligibility date by twenty percent, or both. T.C.A. § 40-35-109(b) (2014). Whether a defendant is an especially mitigated offender rests within the discretion of the trial court. T.C.A. § 40-35-109(a); *see State v. Braden*, 867 S.W.2d 750, 762 (Tenn. Crim. App. 1993).

At the sentencing hearing, the trial court properly consider the factors set out in Tennessee Code Annotated § 40-35-210(b). In considering enhancement and mitigating factors, the trial court found applicable enhancement factor (1), that Defendant Anderson had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." T.C.A. § 40-35-114(1). The trial court, however, gave "very slight weight" to this factor because the offenses were "very minor traffic offenses." Next, the trial court found applicable that Defendant Anderson was a leader in the commission of these offenses. *Id.* § 40-35-114(2). The trial court gave "great weight" to this factor based upon the evidence at trial that Defendant Anderson was the one who communicated with Ms. Ragland, forced his way into the apartment, and held the gun used to accomplish these crimes through the entire incident. Finally, the trial court found that the offenses involved more than one victim but gave this factor "slight weight." *Id.* § 40-35-

114(3). In mitigation, the trial court found that Defendant Anderson was young, nineteen years old, at the time of the offenses, had graduated from high school, and had good mental and physical health.

Defendant Anderson does not qualify for sentencing as an especially mitigated offender. The trial court found multiple enhancement factors applicable in this case. The record shows that the trial court complied with the purposes and principles of the Sentencing Act, properly considered the enhancement and mitigating factors, and sentenced Defendant Anderson within the appropriate range. Moreover, even had Defendant Anderson qualified for consideration as an especially mitigated offender, the trial court did not abuse its discretion in refusing to do so given the serious nature of the offenses for which Defendant Anderson is convicted. *See State v. Buttrey*, 756 S.W.2d 718, 722 (Tenn. Crim. App. 1988). Accordingly, Defendant Anderson is not entitled to relief.

### B. Defendant Harrison
### 1. Exclusion of Preliminary Hearing Transcript

Defendant Harrison asserts that the trial court improperly excluded the preliminary hearing transcript as evidence of Ms. Ragland's prior inconsistent statement. The State responds that the trial court properly held a jury-out hearing and determined that the transcript was overly prejudicial. We agree with the State.

At trial, Ms. Ragland testified that Defendant Harrison pointed her hand toward the back bedroom of the apartment. On cross-examination, Defendant Harrison's attorney questioned Ms. Ragland about whether she testified about Defendant Harrison's gesture toward the bedroom during the preliminary hearing and Ms. Ragland indicated that she had. When presented with the preliminary hearing transcript and reviewing her testimony, Ms. Ragland stated, "It's not on there, but I told you, I did say that she pointed at the back of my - - towards the back of my house." After further questioning, Defendant Harrison's attorney requested the trial court enter the preliminary hearing transcript into the record. The trial court held a jury-out hearing and concluded that the transcript would not be admitted:

> My only concern is is that there's references apparently to the Defendant [Anderson] in here . . . [T]here's a lot of hearsay references in this transcript. As a matter of fact, [Defendant Harrison's attorney] I see where you objected to several things that are contained in this transcript. . . . I understand you're trying to show inconsistency in that she allegedly didn't say certain things at the preliminary hearing. I'll let you cross examine her about that. . . . I just think it would be overly prejudicial to allow this into evidence, especially if there's some references to the co-defendant.

The admissibility, relevancy, and competency of evidence are matters entrusted to the sound discretion of the trial court. With that principle in mind, we review the trial court's evidentiary rulings for an abuse of discretion. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Gray*, 960 S.W.2d 598, 606 (Tenn. Crim. App. 1997). The admissibility of the prior statement of a witness is governed by Tennessee Rule of Evidence 613, which provides, in part, "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." If the statement is admissible under Rule 613, Tennessee Rule of Evidence 803 provides for the following additional conditions:

> 1. The declarant must testify at the trial or hearing and be subject to cross-examination about the statement.

> 2. The statement must be audio or video recorded, written and signed by the witness, or given under oath.

> 3. The trial court must conduct a jury-out hearing to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26) & Advisory Commission Comments.

We agree that the conditions of Rules 613(b) and 803(26) have been met. The witness was afforded an opportunity to explain or deny the statement, the statement was given under oath, Ms. Ragland testified at trial and was subject to cross-examination concerning her statements during the preliminary hearing, and the trial court conducted a jury-out hearing during which it determined that Ms. Ragland made the statement under oath at the preliminary hearing in this case. The trial court, however, considering the co-defendant's objection to the admission of the record, determined that the probative value of the introduction of the transcript was substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403. The preliminary hearing transcript contained references against Defendant Anderson, "a lot of hearsay references," and Defendant Anderson was not present at the preliminary hearing.

Defendant Harrison has failed to show that the trial court abused its discretion. The record supports the trial court's decision that the probative value of the preliminary hearing transcript was substantially outweighed by the danger of unfair prejudice. Defendant Harrison, through cross-examination, made the jury aware that Ms. Ragland had not testified

consistently at the preliminary hearing. Defense counsel questioned Ms. Ragland and then presented her with a transcript. Ms. Ragland admitted that her statement that Defendant Harrison pointed toward the back bedroom was not in the preliminary hearing transcript. Under this circumstance the admission of the preliminary hearing transcript was cumulative. Accordingly, the trial court did not abuse its discretion in excluding the preliminary hearing transcript. Defendant Harrison is not entitled to relief.

## 2. Severance

Defendant Harrison identifies, "Whether [the trial court] should have severed the trial with the co-defendant?" as an issue for our review. She does not, however, cite to the record or any legal authority in support of this issue. The Rules of Appellate Procedure require that citations to authority and references to the record be included in the argument portion of the brief. Tenn. R. App. P. 27(a)(7). The rules of this Court also contemplate waiver of issues not supported by citation to authorities or appropriate references to the record. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). We deem this issue waived due to Defendant Harrison's failure to cite to any legal authorities.

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

-14-